## STATE vs. SAMUEL E. WILSON.

*Criminal Law—Assault With Intent to Commit Murder—Evidence—Self-Defense—Intent, How Proved.*

1. Simple assault, and assault with intent to commit murder defined ; and also the different degrees of murder.

2. How the intent to commit murder may be proved.

3. Where one is assaulted upon a sudden affray and, in the judgment of the jury, honestly believes on reasonable and sufficient grounds, that he is in imminent danger of being killed, or of receiving great bodily harm, he would have, in self-defense, the right to use a deadly weapon against the assailant. But in exercising such right of self-defense, in a manner likely to cause death or great bodily harm to his assailant, he must be closely pressed by him, and must have retreated as far as he conveniently and safely could, in good faith, with the honest intent to avoid the violence and peril of the assault. If these be so sudden, fierce or urgent as not to allow him to retreat, or to have other probable means of escape then he may rightfully use a deadly weapon in his defense.

4. A woman was called by the defense as a witness and objected to by the State on the ground that she was the wife of the defendant. Upon the facts before them the Court held that it was not sufficiently shown that they were husband and wife, and the case not analogous to that of *State vs. Vincent R. Miller, 3 Pennewill, 518.*

(*April 30, 1904.*)

Judges SPRUANCE, GRUBB and BOYCE, sitting.

*Herbert H. Ward,* Attorney-General, and *Robert H. Richards* Deputy Attorney-General, for the State.

*Richard R. Kenney* and *Arley B. Magee* for the defendant.

Court of General Sessions, Kent County, April Term, 1904.

INDICTMENT FOR ASSAULT WITH INTENT TO COMMIT MURDER.

The defendant, Samuel E. Wilson, was indicted at this term for assault upon one Edward Damph with intent to murder the said Damph. The State proved the following facts: That both Damph and the defendant Wilson lived in Philadelphia; that while living in Philadelphia the defendant had formed the acquaintence of one Mina Jarrell, after which the two lived together there as man and wife, though not married; that the defendant's business took him away from Philadelphia frequently, and that while so away from the city, some months before the assault occurred, Mina Jarrell and Damph met by chance at a boarding house in Philadelphia, where they became acquainted, after which, at another place, they lived together as man and wife, though not married; that Damph, although he had lived with Mina Jarrell for some time, had never met Wilson until the day of the assault, though she had mentioned Wilson to him and had shown him Wilson's picture. That a short time before the day of the assault Mina Jarrell was called to Felton, Delaware, where her parents lived, on account of the mortal sickness of her father; that while there she corresponded with Damph, and upon the death of her father invited Damph to come to Felton to attend the funeral and to assist her in regard to settling up her father's affairs. Damph came down from Philadelphia and Wilson also came down on the same train, but the one not knowing the other they were not attracted to each other and did not meet; that Wilson formed a part of the funeral party that day and drove with Mina Jarrell in a carriage to the place of interment, a cemetery near Harrington; that Damph, after arriving at Felton, hired a horse and carriage and drove alone to the cemetery, passing Wilson and Mina Jarrell on the way. That both Wilson and Damph attended the funeral; that after the funeral Wilson started back towards Felton with Mina Jarrell in the carriage with him; that Damph preceded them to Harrington; that Wilson and Mina Jarrell passed through Harrington and Damph followed after them in his carriage, and when they had gotten nearly to Felton Damph drove by them a short distance, then turned around and drove back, turning his

horse's head diagonally across the road so that Wils n could not pass, and got out of his carriage and suggested to Mina Jarrell to get in the carriage with him, announcing to Wilson then that Mina Jarrell had called herself his wife. That thereupon Miss Jarrell arose upon her seat in Wilson's carriage and Damph lifted her out of Wilson's carriage and carried her a few paces and sat her down upon the side path; that Wilson remained in his carriage; that meanwhile, when Damph had gotten out of his carriage, his horse had gone on down the road, and after he placed Miss Jarrell on the side path and they had walked a little distance, he said they could hardly get to Felton that way and he would go on and catch his horse; that he went on about one hundred yards or so, caught his horse and turned back leading his horse walking in the road; that meanwhile Miss Jarrell walked on the side path in the same direction that Damph had taken and Wilson drove along beside her with his horse in a walk; that after a short space of time, Damph having caught his horse and turned it back, met the two as they were coming down the road; that when he met them he turned his horse around or started to turn it around in the road and that brought him upon the same side of the road and on the same side of his horse as Miss Jarrell was on; that about that time Wilson had gotten out of his carriage—having his revolver free in his overcoat and with his hand upon his pistol—and as Damph was starting to help Miss Jarrell into his carriage Wilson, without warning, pulled his pistol and shot at Damph, and after the first shot immediately fired again; that the first shot did not take effect but that the second shot did; the wound that Damph then received being upon the left side of his head, and the course that the bullet took when it entered the head, according to the testimony, indicated that it was fired from the rear, when Wilson was not exactly behind Damph but at a little angle to the rear of him; that the shot fired was from a 44-calibre revolver, and struck Damph over the ear and fractured the skull, a portion of the bullet lodging in the skull and driving splinters thereof into the brain (some splinters of the skull opening the brain and letting out small portions of

brain matter), and then giving a ragged wound as it left the head a little distance further over towards the forehead; that that wound staggered Damph and he fell to the ground, when he reached towards his rear pocket for the purpose of drawing his revolver, having been shot twice; that as soon as Damph reached for his revolver, and was trying to get it out of its leather case, Wilson stooped over him and fired the third time, before Damph could get his revolver out of its case, the bullet hitting Damph on the side of his nose; it could not be determined in what portion of his head the bullet finally lodged, as it was never recovered; that a portion of the bullet that had lodged in the skull was taken from his skull by the operating surgeon at the Delaware Hospital in Wilmington, where Damph was subsequently carried. That Damph was for a short space of time unconscious, but reviving he got into his carriage and in a confused sort of way asked someone, who happened along, in what direction Felton was, and being told he drove a few paces in the opposite direction, and then turned his horse towards Felton and drove off.

It was further proved that the nature of the wounds received by Damph was exceedingly dangerous and the chances of his recovery were very slight, but owing to his good constitution, native strength of body and as a result of skillful treatment in the Hospital, he finally recovered.

The evidence on the part of the defense was to the effect that when Damph first came up to Wilson's carriage he said, " Is that Mr. Wilson ?" That Wilson replied " That is my name." That he then said, " Who is that you have in there with you ?" That Wilson replied, " This is Miss Jarrell." That Damph then said " Miss Jarrell calls herself my wife and she must get out of there and get in with me"; that as he said these words he had his hand upon his hip pocket, and Miss Jarrell said to Wilson, "Oh, Sam, he is going to shoot you, let me get out"; that Miss Jarrell thereupon jumped out of the carriage, assisted by Damph, and walked with the latter along the side path of the road, until Damph went ahead to recover his horse, and that when Damph returned to Miss

Jarrell after catching his horse, he had some words with Wilson who was walking beside Miss Jarrell, and immediately drew his revolver as if to shoot Wilson and that Wilson drew his revolver and shot back in self-defense.

*Mina Jarrell,* being produced as a witness on behalf of the defendant, the Attorney-General asked that she be first sworn on her *voidire,* which was accordingly done and the witness was questioned by the Deputy Attorney-General as follows:

Q. Will you look at the paper which I now hand you, and state whose signature it bears?

A. That is my signature.

Q. What is the name signed there by you?

A. Mrs. Mina Wilson.

Q. Where did you sign that?

A. In Felton at our home.

Q. Whose signature is the other one appearing thereon?

A. My mother's.

Q. Did you see that signature placed there?

A. Yes, sir.

Q. Did this defendant, Samuel E. Wilson, attend the funeral of your father as your husband?

A. As Mr. and Mrs. Wilson we attended the funeral, yes, sir.

Q. You mean yourself and the defendant?

A. Yes, sir.

Q. Did you present the defendant to your family as your husband?

A. My people supposed he was my husband, yes sir.

Q. Did you ever present him to your people as your husband?

A. I had to make them believe he was my husband.

Q. Did you hold yourself out to your people and to the public in the community of Felton as his wife?

A. Yes, sir.

(The Deputy Attorney-General here offered the above mentioned paper in evidence, being a bail bond of said witness signed

and sealed in due form, for her appearance as a witness at the then term of Court in the case of State vs. Samuel E. Wilson. Pending the admission of said paper, the witness was cross-examined as follows):

*By Mr. Kenney:*

X. You say that you represented yourself to be the wife of Mr. Wilson to your family?

A. Yes, sir.

X. When you signed this bail bond, at the time of this occurence at Felton, on the 15th day of March last, you signed it Mrs. Mina Wilson?

A. Yes, sir.

X. Why?

A. Because my mother was there and I must.

X. Did you hold yourself out to any other persons than your family as the wife of Mr. Wilson?

A. No, sir.

X. Then it was to them alone that you represented yourself to be his wife?

A. Yes, sir.

X. Were you, in fact, ever married to Mr. Wilson?

(Objected to by the Deputy Attorney-General and question withdrawn).

*Mr. Richards :*—We object to this witness testifying, upon the ground that she has signed and sealed a bail bond, an instrument of a solemn nature, for her appearance in this Court as a witness, and signed it Mrs. Mina Wilson and has testified upon her oath that in so signing it she signed her name as the wife of this defendant; and in addition to the signature to this solemn instrument under seal she held herself out to the people of Felton and to her own family as this man's wife. She has not denied that she is his wife, and she cannot, I think, deny that she is his wife, upon this showing; upon her own acts and her own testimony she has admitted that she is his wife, and cannot now deny it.

*State vs. Vincent R. Miller, 3 Pennewill, 518.*

GRUBB, J.:—We are prepared to decide this question without hearing the other side. The Deputy Attorney-General has cited the case of State *vs.* Vincent R. Miller. If you will examine that case, as we have just done, you will find that there were a great many more facts furnished in that case than in this. We hold that there is not sufficient proof of a marriage before us to exclude the testimony of this witness at this stage, and therefore we refuse to exclude her testimony at this stage of the case. We consider that she is a competent witness in this case. Let her be sworn.

(The witness was thereupon sworn as a witness on behalf of the defendant and testified in effect that what Wilson did was in self-defense).

GRUBB, J., charging the jury :

Gentlemen of the jury :—This indictment charges Samuel E. Wilson with an assault with intent to murder Edward Damph the prosecuting witness.

Under this indictment you may find the accused guilty either of assault with intent to murder, or of simple assault merely or not guilty of either, according as the law and the evidence may warrant your verdict.

In order to warrant you in finding that he is guilty in manner and form as he is indicted, that is, not only of the assault but of the assault with intent to murder as charged in this indictment, it is incumbent upon the State to satisfy you from all the evidence in the case, beyond a reasonable doubt, not only that the alleged assault was committed by the accused but also that it was made by him with the intent to murder the prosecuting witness Edward Damph. Such intent to murder is absolutely material and essential to be proven as a fact in this case before you can find him guilty of the said assault with intent to murder.

An assault is an unlawful attempt by violence to do injury to the person of another, the person making the attempt having the present ability to commit such injury.

As, in addition to the assault, the intent to murder is also charged in this indictment, it is necessary for us to define to you what murder, within the meaning of the law, is. For you must be satisfied from the evidence, beyond a reasonable doubt, that the prisoner's alleged act (if Edward Damph's death had actually been caused thereby) would be murder of the first or second degree, before you can render a verdict of guilty of the intent to murder.

To constitute the statutory offense of assault with intent to commit murder, the circumstances must be such as to show that it would have been murder if the assailant had accomplished such intent.

Murder is where a person of sound memory and discretion unlawfully kills any human being with malice aforethought, either express or implied. The chief characteristic of this crime, distinguishing it from every other kind of homicide, and therefore indispensably necessary to be proved, is malice prepense or aforethought.

Under the statute law of this State there are two degrees of murder, viz., murder of the first and murder of the second degree. The first is where the crime of murder is committed with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death; and the second degree is where the crime of murder is committed otherwise, and with malice aforethought implied by law. The express malice which constitutes murder of the first degree, is proved by circumstances attending the act satisfactorily evidencing a sedate deliberate purpose and formed design to kill another, such as the deliberate selection and use of a deadly weapon, lying in wait, and the like.

Implied or constructive malice is an inference or conclusion of law from the facts found by the jury. Therefore murder of the second degree may be proved where it is not satisfactorily shown by the evidence submitted to the jury that the killing was done with a sedate deliberate purpose and formed design to take life, or in perpetrating or attempting to perpetrate any crime punishable with death, but is so shown that it was done suddenly, without

justification or excuse, and without any provocation, or without provocation sufficient to reduce the homicide to the grade of manslaughter, or in committing or attempting to commit a felony not capitally punishable, or some act of violence from which the law presumes malice.

Malice is implied by law from every deliberate cruel act committed by one person against another, no matter how sudden such act may be. For the law consideres that he who does a cruel act voluntarily does it maliciously. And whenever the act from which death ensues is proven by the prosecution, unaccompanied by circumstances of justification, excuse or mitigation, the law presumes that the homicide was committed with malice; and it is thereupon incumbent upon the prisoner to show by evidence that the killing was not malicious and therefore does not amount to murder.

Having explained to you what an assault is, and having also stated to you that in addition to the proof of the assault (if it has been proven to you) the prosecution must show the intent to murder the person named in the indictment—that is to kill him with either express or implied malice aforethought—it becomes necessary for us further to state to you how such intent to murder may be shown to your satisfaction.

The intent to commit murder may be shown by direct evidence of the intent—that is, by the express confession or declaration of the accused that he committed the alleged assault with intent to murder; or, if there be no such direct evidence, the intent to murder may be proved by the acts or the conduct of the accused, and other circumstances, from which the jury may naturally and reasonably infer the intent charged. For instance, it is a principle of law that every man must be presumed to intend the natural and probable consequences of his own voluntary or wilful act. So that from the use of a deadly weapon against another, the jury may infer the intent to commit murder, unless the circumstances in the case satisfy you to the contrary.

As to the question of the intent to murder as charged in this indictment, it is for you to say from the testimony before you

whether there is such evidence, taken in connection with all the facts in the case, as will warrant you in inferring that the accused assaulted Edward Damph with intent to murder him. Such intent, as we have said, being provable by and inferable from the voluntary, unlawful use, in a manner, or under circumstances perilous to human life, or directly tending to great bodily harm, of a loaded pistol or other weapon which the law considers a deadly weapon, or of any other instrument or missile reasonably likely to take human life when so used.

Samuel E. Wilson, the accused, admits that he shot Edward Damph, the prosecuting witness, but claims that he did it in necessary self-defense.

If the jury are satisfied upon consideration of all the evidence in this case that no unlawful violence against the person of Wilson was committed or attempted by Damph, but that the shooting by Wilson was done, not for his own protection, but to gratify a feeling of revenge or malice against Damph, then his plea of self-defense cannot avail for his acquittal, as it otherwise might do.

The law accords to every one the right to protect his person from assault and injury by opposing force to force, and he is not obliged to wait until he is struck by an impending blow ; for if a weapon be raised in order to shoot or strike, or the danger of other personal violence be imminent, the party in such imminent danger may protect himself by striking the first blow for the purpose of repelling and preventing the attempted injury. But the opposing force or measure of defense must not be unreasonably disproportionate to the requirements of the occasion. Although so much force as is reasonably necessary may be used, yet if the violence used is greater than was necessary, under the circumstances, to repel the assault or avert the peril, the party using it is himself guilty ; for the law recognizes the right of self-defense for the purpose of preventing but not of revenging an injury to the person of the accused.

Where one is assaulted upon a sudden affray, and in the *judgment* of the *jury*, honestly believed on reasonable and sufficient

grounds, that he was in imminent danger of being killed, or of receiving great bodily harm, he would have, in self-defense, the right to use a *deadly* weapon against his assailant.   But in exercising such right of self-defense, in a manner likely to cause death or great bodily harm to his assailant, he must be closely pressed by him, and must have retreated as far as he conveniently and safely could, in good faith, with the honest intent to avoid the violence and peril of the assault.   If these be so sudden, fierce or urgent as not to allow him to retreat, or to have other probable means of escape then he may rightfully use a *deadly* weapon in his defense.

In conclusion, gentlemen of the jury, we remind you that the State must prove to your satisfaction, beyond a reasonable doubt, either the assault with intent to murder, or the simple assault, as charged in this indictment, before you can find a verdict of guilty of either offense.

A reasonable doubt is not a mere imaginary, whimsical, or even possible doubt, of the guilt of the accused, but is such a real and substantial doubt as intelligent and impartial men may reasonably entertain upon a careful consideration of all the relevant facts proven in the case.

The jury disagreed.